[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 6, 2011
JOHN LEY
CLERK

_____

No. 08-15868

_____

D. C. Docket No. 08-14036-CV-WPD

HAROLD LEE HARVEY, JR.,

Petitioner-Appellant,

versus

WARDEN, UNION CORRECTIONAL INSTITUTION
WARDEN, FLORIDA STATE PRISON,
SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 6, 2011)

Before TJOFLAT, CARNES and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

Harold Lee Harvey, Jr. is an inmate on Florida's death row, having been convicted of two counts of first-degree murder in 1986. This case comes to us after seventeen years of post-conviction proceedings in the Florida courts, including two evidentiary hearings and two appeals to the Florida Supreme Court. Before this court, Harvey appeals the denial of his petition for a writ of habeas corpus by the United States District Court for the Southern District of Florida. Each of his four claims for relief focuses on the constitutional deficiency of his trial counsel during both the guilt and penalty phases of his trial.

Part I discusses the facts of Harvey's crime and the procedural history. Part II discusses the relevant standard of review and general principles for claims of ineffective assistance of counsel. Part III addresses Harvey's claim that trial counsel failed to strike a biased juror. Part IV addresses Harvey's claim that trial counsel conceded Harvey's guilt during his opening statement to the jury without Harvey's consent. Part V addresses Harvey's two claims that trial counsel did not conduct an adequate investigation into mitigation evidence, with part V.A discussing trial counsel's social history investigation and part V.B discussing trial counsel's mental health investigation. Part VI concludes.

I.

The Florida Supreme Court described the facts of Harvey's crime as follows:

On February 23, 1985, Harold Lee Harvey met with Scott Stiteler, his codefendant at trial, and drove to the home of William and Ruby Boyd, intending to rob them. Upon their arrival, Stiteler knocked on the front door. In the meantime, Harvey grabbed Mrs. Boyd as she was walking around from the side of the house and took her into the house where Mr. Boyd was located. Harvey had a pistol and Stiteler was holding Harvey's AR-15 rifle which had recently been converted into an automatic weapon. Harvey and Stiteler told the Boyds they needed money. Mr. Boyd then went into the bedroom and got his wallet. Sometime during the course of the robbery, Harvey and Stiteler exchanged guns so that Harvey now had possession of the automatic weapon. After getting the money from the Boyds, Harvey and Stiteler discussed what they were going to do with the victims and decided they would have to kill them. Sensing their impending danger, the Boyds tried to run, but Harvey fired his gun, striking them both. Mr. Boyd apparently died instantly. Harvey left the Boyds' home but reentered to retrieve the gun shells. Upon hearing Mrs. Boyd moaning in pain, he shot her in the head at point blank range. Harvey and Stiteler then left and threw their weapons away along the roadway.

On February 27, 1985, Harvey was stopped for a driving infraction in Okeechobee County and subsequently placed under arrest for the Boyds' murders. He was read his Miranda rights at that time. He was then transported to the Okeechobee County Sheriff's Department and again read the Miranda warning. Harvey was questioned and interrogated, and after speaking with his wife, gave a statement in which he admitted his involvement in the Boyds' murders.

Harvey v. State, 529 So. 2d 1083, 1084 (Fla. 1988).

On March 7, 1985, an Okeechobee County grand jury indicted Harvey and Stiteler on two counts of first-degree murder, under both premeditation and felony murder theories. The two defendants were tried separately. Harvey's trial and 1993 post-conviction proceedings took place in the Circuit Court for Indian River County[1]; Harvey's 1998 post-conviction proceedings took place in the Circuit Court for Okeechobee County. The court appointed Robert Watson, a private attorney, to represent Harvey.[2] Admitted to the bar in 1979, Watson began his career with the Public Defender's office[3] and worked there until 1981. During his time there, he represented defendants in ten capital murder cases, always as second chair.

Following his appointment, Watson requested and received funds for private investigators and mental health examinations. He also moved the court to

---

[1] Okeechobee County and Indian River County are part of the Nineteenth Judicial Circuit of Florida. The indictment was returned to the Okeechobee County Circuit Court. Judge Dwight Geiger, a judge of the Nineteenth Judicial Circuit, was assigned to the case. He presided throughout the trial and post-conviction proceedings. Judge Geiger transferred the venue for Harvey's trial from Okeechobee County to Indian River County due to pre-trial publicity.

[2] Harvey was originally represented by the Office of the Public Defender, which was appointed on March 7, 1985. The Public Defender withdrew from Harvey's representation citing conflict of interest because it also represented Harvey's co-defendant, Stiteler. Watson was appointed on March 25, 1985.
Watson represented Harvey unassisted. He moved to appoint co-counsel for Phase I (guilt-phase) on August 20, 1985. The court denied his request on August 29, 1985.

[3] Watson was an assistant in the Officer of the Public Defender for the Nineteenth Judicial Circuit.

suppress Harvey's post-arrest confession to the police.[4]  The court held an

evidentiary hearing on the motion on June 11 and 12, 1986, and denied the motion

on June 13, 1986, before the court concluded the final day of jury selection.

Jury selection began on June 9 and ended on June 13, 1986.  Marlene

Brunetti was chosen as an alternate juror on June 13, 1986.  Her voir dire exposed

potential biases but Watson did not move to strike her with a peremptory

challenge or for cause.[5]  During the trial, a juror took ill and Brunetti was seated

on the jury.

Harvey's trial began on June 13, 1986, immediately after jury selection

concluded.[6]  In his opening statement to the jury, Watson conceded the facts of the

murder, but said that Harvey was not guilty of first-degree murder because he

committed the homicides without premeditation and after the robbery had already

taken place.  Instead of first-degree murder, the evidence would show that he was

---

[4]  Watson filed three motions to suppress Harvey's statement: the first motion was filed on June 7, 1985; the second motion was filed on October 9, 1985, which amended the June 7 motion; the third motion was filed on January 29, 1986, which raised different grounds for suppression.  Watson filed several other pre-trial motions not pertinent here.

[5] Harvey's first ineffective-assistance claim centers on Watson's decision to seat Brunetti.  Part III provides Brunetti's voir dire in detail.

[6]  According to the trial transcript, Brunetti was seated during a court session beginning at 2:00 p.m. on June 13, 1986.  Opening statements began during a court session beginning at 2:45 p.m. on the same date.

guilty of second-degree murder.[7] Watson presented no evidence during the guilt phase of the trial and maintained his concession strategy in his closing argument to the jury. The jury unanimously convicted Harvey of two counts of first-degree murder.

The penalty phase for the murder counts began two days later, before the same jury. The State, in its case in chief, relied on the evidence it presented during the guilt phase and the testimony of two witnesses to prove aggravating factors. A prison inmate named Hubert Bernard Griffin testified that, while incarcerated in a jail cell adjacent to Harvey's (prior to Harvey's trial), he saw that Harvey had written threatening language on the walls of his own cell: "If I can't kill it then its already dead." George Miller, a corrections officer in the same jail corroborated Griffin's testimony; he had seen the same writing.

Watson, in Harvey's defense, endeavored to show that Harvey was a "good person," for whom the murders were an aberration, and thus would be worthy of mercy. To that end, he called seventeen mitigation witnesses. Sixteen witnesses were family and friends whose testimony painted the picture of a nice, shy young

---

[7] Watson's opening statement is the subject of Harvey's second ineffective-assistance claim. Specifically, Harvey argues that Watson did not get Harvey's consent to the strategy of conceding guilt for second-degree murder and, that even if he consented, Watson's opening statement actually conceded first-degree murder without his consent. Part IV presents Watson's opening statement in greater detail.

man, who loved his family very much.  Nearly all mitigation witnesses expressed shock at Harvey's arrest and said that what he had done did not fit with his character.  Some of these witnesses also portrayed him as being dominated by his wife of one year—her lifestyle demands serving as motive for robbing the Boyds.

Watson also called a psychologist, Dr. Frank Petrilla, to testify to the results of the personality evaluation he performed on Harvey prior to trial.  Dr. Petrilla diagnosed Harvey with "dysthymic disorder, chronic depressive reaction and dependant and personality disorder."  Dr. Petrilla also noted that Harvey had a "passive" personality and a below average IQ.  He said that Harvey had poor coping skills that would harm his ability to reason during times of stress.

The jury recommended the death penalty for each murder by a vote of 11-1.  The court found four aggravating circumstances: the murders were committed (1) while the defendant was engaged in the commission or an attempt to commit robbery and burglary, Fla. Stat. § 921.141(5)(d) (1985); (2) for the purpose of avoiding or preventing a lawful arrest, id. § 921.141(5)(e); (3) in a cold calculated and premeditated manner, id. § 921.141(5)(i); and (4) the murders were especially heinous atrocious and cruel, id. § 921.141(5)(h).  The court found only one mitigating factor—the non-statutory catch-all, "any other aspect of the defendant's

character or record"[8]: Harvey's low IQ (86), poor education and social skills, and inability to reason abstractly, combined with low self-confidence and feelings of inadequacy. The court rejected three statutory mitigating factors: (1) lack of significant history of prior criminal activity, id. § 921.141(6)(a); (2) age of the defendant, id. § 921.141(6)(g); and (3) murder committed under the influence of extreme mental or emotional disturbance, id. § 921.141(6)(b). The court found that the aggravating factors outweighed the mitigating factors and sentenced Harvey to death on both murder counts.

Harvey appealed his murder convictions and death sentences to the Florida Supreme Court. His brief raised claims not at issue in this appeal. On June 16, 1988, the Florida Supreme Court affirmed. Harvey, 529 So. 2d at 1088. The United States Supreme Court denied certiorari. Harvey v. Florida, 489 U.S. 1040, 109 S. Ct. 1175, 103 L. Ed. 2d 237 (1989). The Governor signed Harvey's execution warrant on March 29, 1990.

---

[8] This mitigating factor was subsequently codified in Fla. Stat. § 921.141(6)(h) (2008) ("The existence of any other factors in the defendant's background that would mitigate against imposition of the death penalty.").

On August 27, 1990, Harvey filed a motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850 in the trial court.[9]  In his motion, Harvey raised seventeen claims—several with various subparts.[10]  The court dismissed as

[9]  Harvey filed a corrected copy of that motion on September 24, 1990.

[10] The Florida Supreme Court summarized Harvey's claims:

(1)(a) trial counsel was ineffective for failing to make several arguments in support of his motion to suppress Harvey's confession; (1)(b) trial counsel was ineffective for failing to challenge juror Brunetti for cause or peremptorily after she stated she could not be impartial; (1)(c) trial counsel was ineffective for failing to object to the trial court's change of venue to Indian River County; (1)(d) trial counsel was ineffective for making claims in his opening statement that were not later established; (1)(e) trial counsel was ineffective for failing to raise a valid objection to the admission of hearsay testimony relating to Harvey's pretrial escape; (1)(f) trial counsel was ineffective for admitting Harvey's guilt during opening statements; (2)(a) trial counsel was ineffective for failing to adequately investigate and present mitigating evidence; (2)(b) trial counsel was ineffective for failing to establish the substantial domination mitigating factor; (2)(c) trial counsel was ineffective during his penalty-phase closing argument; (2)(d) trial counsel was ineffective for failing to waive the no significant history mitigating factor; (2)(e) trial counsel was ineffective for allowing the State to anticipatorily rebut evidence of remorse when such an argument was not made; (2)(f) trial counsel was ineffective for failing to present evidence or argument at the final sentencing hearing; (2)(g) trial counsel was ineffective for failing to investigate and confirm that the victims overheard Harvey and the co-defendant deciding to kill them; (3) trial counsel was ineffective for failing to ensure that Harvey received a competent mental health examination; (4) Harvey was tried by a de facto eleven-person jury; (5)(a) the trial court rendered trial counsel ineffective by refusing to hear and rule on Harvey's motion to suppress prior to jury selection; (5)(b) the trial court rendered trial counsel ineffective by denying counsel's motion for co-counsel; (5)(c) the trial court rendered trial counsel ineffective by denying counsel's motion for continuance made between the guilt and penalty phases of the trial; (6) the trial court failed to expressly evaluate all mitigating factors, failed to find each proposed mitigating circumstance, and failed to weigh those factors against the aggravating factors; (7) fundamental changes in the law require resentencing because the trial court improperly rejected the no significant history mitigating factor based on offenses committed after the murders but before sentencing; (8)(a) the trial court failed to properly instruct the jury regarding the

9

facially insufficient all claims save one: that Watson rendered ineffective assistance of counsel in not striking the "admittedly biased juror," Brunetti. The court held an evidentiary hearing on that claim on March 11, 1993. On March 17, 1993, the court denied the claim and Harvey's Rule 3.850 motion.

Harvey appealed the trial court's Rule 3.850 rulings to the Florida Supreme Court. On February 23, 1995, it rendered its decision. Harvey v. Dugger, 656 So.

---

heinous, atrocious, or cruel and cold, calculated, and premeditated aggravating factors; (8)(b) the penalty-phase jury instructions and the prosecutor's closing argument precluded the jury from considering sympathy in recommending a sentence; (8)(c) the trial court erred in refusing to answer two jury questions relating to when Harvey would be eligible for parole and whether life sentences would be imposed consecutively; (8)(d) the trial court erred in denying Harvey's special requested penalty-phase instructions; (9) the penalty-phase jury instructions improperly shifted the burden to Harvey to prove that the mitigating factors outweighed the aggravating factors, and trial counsel was ineffective for failing to object to them; (10) the heinous, atrocious, or cruel instruction was unconstitutionally vague, and trial counsel was ineffective for failing to object to the lack of a limiting instruction; (11) the cold, calculated, and premeditated instruction was unconstitutionally vague, and trial counsel was ineffective for failing to object to the lack of a limiting instruction; (12)(a) the State withheld the fact that witness Griffin had been used as a jail-house informant in other cases; (12)(b) the State withheld the fact that Harvey requested counsel after his arrest; (13) Florida Rule of Criminal Procedure 3.851 violates Harvey's rights to due process, equal protection, and access to the courts; (14) the jury was improperly instructed that its role was merely advisory; (15) the State improperly argued victim-impact evidence; (16) trial counsel was ineffective for failing to object to the admission of evidence that Harvey threatened to kill a fellow inmate; and (17) Florida's system for funding the defense of indigent capital defendants violates due process and equal protection.

Harvey v. Dugger, 656 So. 2d 1253, 1254–55 (Fla. 1995). The court considered Harvey's ineffective assistance claims to have been prosecuted under the standard established by Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Harvey, 656 So. 2d at 1257.

2d 1253 (Fla. 1995). The court affirmed the trial court's denial of most of Harvey's claims, but found that an evidentiary hearing would be necessary to resolve four ineffective assistance claims, three of which are pertinent here: (1) Watson rendered ineffective assistance by conceding Harvey's guilt during his opening statement to the jury without Harvey's consent; (2) Watson did not adequately investigate life-history mitigation evidence; and (3) Watson did not adequately investigate mental health mitigation, which would have included evidence of organic brain damage. Id. at 1256–57.

In August 1998, the trial court held an evidentiary hearing on the designated ineffective assistance claims, judging Watson's performance under the standard established by Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The court found that Watson's performance satisfied that standard and, in January 1999, entered an order denying each of the designated claims. Harvey appealed the court's rulings to the Florida Supreme Court.

On July 3, 2003, the Florida Supreme Court reversed the trial court's denial of Rule 3.850 relief as to the first of the designated ineffective assistance claims, vacated Harvey's murder convictions and death sentences, and remanded the case for a new trial. Harvey v. State, No. SC95075, 2003 Fla. LEXIS 1140 (Fla. July 3, 2003). It held that Watson's opening statement conceded first-degree murder and

11

that the concession was the "functional equivalent of a guilty plea." Id. at *11. As such, Watson did not "subject the prosecution's case to meaningful adversarial testing" under United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). Harvey, 2003 Fla. LEXIS 1140, at *11. Harvey therefore did not need to show prejudice under Strickland; rather, the court presumed prejudice under Cronic. Harvey, 2003 Fla. LEXIS 1140, at *11. The court relied on Nixon v. Singletary, 758 So. 2d 618 (Fla. 2000), which held that concessions without the defendant's consent constitute ineffective assistance per se under Cronic. Harvey, 2003 Fla. LEXIS 1140, at *11–12.

The State petitioned the Florida Supreme Court for rehearing. While its petition was pending, the United States Supreme Court reversed the Florida Supreme Court's per se rule in Florida v. Nixon, 543 U.S. 175, 187, 125 S. Ct. 551, 560, 160 L. Ed. 2d 565 (2004). Relying on this decision, the Florida Supreme Court vacated its 2003 opinion and, on June 15, 2006, rejected the ineffective assistance claim at issue in a new opinion. Harvey v. State, 946 So. 2d 937, 940 (Fla. 2006). The court adhered to its earlier finding that Watson's opening statement conceded first-degree murder without Harvey's consent, id. at 942–43, but found that Harvey had not shown Strickland prejudice because the jury received in Harvey's confession the same information contained in Watson's

12

concession, id. at 943–44.  The court rejected the claims that Watson failed to

investigate adequately Harvey's life-history and mental health mitigation

evidence.  Id. at 947, 948.

Two justices concurred in part and dissented in part.  In their view,

Watson's concession to first-degree murder and "superficial [mitigation]

investigation" left "no genuine adversarial testing of the appropriate penalty."  Id.

at 951 (Anstead, J., concurring in part and dissenting in part).

On January 18, 2008, Harvey petitioned the United States District for the

Southern District of Florida for a writ of habeas corpus.  See 28 U.S.C. § 2254(d).

His petition presented twelve claims,[11] including the four ineffective assistance of

counsel claims raised in this appeal.  The district court denied his petition.  He

then requested a certificate of appeal under 28 U.S.C. § 2253(c) for six of his

---

[11] Harvey's claims were that Watson had rendered ineffective assistance of counsel in (1) failing to perform mental a health investigation; (2) failing to perform a non-mental health investigation; (3) conceding guilt in the opening statement without first disclosing the strategy to Harvey or obtaining his consent; (4) failing to strike an admittedly biased juror, Brunetti; (5) failing to use a booking sheet that allegedly indicated Harvey's request for a lawyer before his interrogation by police as a basis to suppress his confession; (6) failing to object to the trial court's change of venue; (7) making claims in the opening statement that were not proven to the jury during Harvey's case in chief; (8) failing to raise a valid objection to certain hearsay testimony; (9) allowing the State to anticipatorily rebut the non-statutory mitigating circumstance of remorse when the defense did not argue that such mitigating circumstance existed; (10) failing to investigate the evidence supporting the heinous, atrocious and cruel aggravating circumstance; and (11) failing to waive the statutory mitigating circumstance of no significant history of prior criminal activity, and that trial court (12) violated his Sixth Amendment rights to an "impartial and qualified jury" by failing either to strike juror Brunetti sua sponte or obtain an on-the-record waiver from Harvey when it seated juror Brunetti.

13

twelve claims. Five were claims that Watson rendered ineffective assistance of counsel in (1) failing to investigate mental health mitigation, (2) failing to investigate non-mental health mitigation, (3) conceding guilt in his opening statement to the jury without Harvey's prior authorization, (4) failing to strike juror Brunetti, and (5) failing to introduce a booking sheet suggesting that Harvey requested a lawyer before confessing to the murders. The final claim was that the trial court erred in (6) failing sua sponte to strike juror Brunetti.[12] The district court granted a certificate of appeal for issues (1)–(4) and (6), but denied the certificate for issue (5). This appeal followed.

II.

A.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs Harvey's habeas corpus petition. Under 28 U.S.C. § 2254(d), a federal court cannot overturn a state court conviction on collateral attack unless the state court decision

> (1) . . . was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[12] Harvey did not address this argument in his brief. It is therefore waived.

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).  As the Supreme Court has instructed,

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412–13, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000).

In determining whether we should overturn the state courts' rejection of the claim at issue, we review the highest state court decision disposing of the claim.  See Shere v. Fla. Dep't of Corr., 537 F.3d 1304, 1310 (11th Cir. 2008) ("[O]ur review is limited to examining whether the highest state court's resolution of a petitioner's claim is contrary to, or an unreasonable application of, clearly established law . . . .").  The Florida Supreme Court's 1995 and 2006 decisions[13] are therefore our reference points.[14]

---

[13]  Harvey v. Dugger, 656 So.2d 1253 (Fla. 1995), and Harvey v. State, 946 So. 2d 937 (Fla. 2006).

[14]  Although we are reviewing the district court's decision denying Harvey habeas corpus relief, because that decision was based solely on the district court's determination that the Florida

15

B.

The Sixth Amendment to the United States Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."[15]  U.S. Const. amend. VI.  This clause has been interpreted to mean that the accused shall have the right to the effective assistance of counsel.  See, e.g., McMann v. Richardson, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 1449 n.14, 25 L. Ed. 2d 763 (1970) (citations omitted).  We determine whether the accused has received such assistance under the standard for counsel's performance established by Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

A valid claim of ineffective assistance of counsel requires a two-part showing.  First, trial counsel's performance must be deficient, falling below an objective standard of professional care.  Id. at 688, 104 S. Ct. at 2064.  Second, that deficient performance must have prejudiced the outcome of the petitioner's

---

Supreme Court's 1995 and 2006 decisions rejecting those claims could not be overturned under AEDPA, we are, in effect, standing in the district court's shoes reviewing those Florida Supreme Court decisions under AEDPA.  See Hightower v. Schofield, 365 F.3d 1008, 1014 (11th Cir. 2001), vacated and remanded on other grounds, 545 U.S. 1124, 125 S. Ct. 2929, 162 L. Ed. 2d 863 (2005).

[15]  The Sixth Amendment provision of the right to counsel has been made applicable to the States under the Due Process Clause of the Fourteenth Amendment.  See Gideon v. Wainwright, 372 U.S. 335, 342–45, 83 S. Ct. 792, 795–97, 9 L. Ed. 2d 799 (1963).

16

trial; but for the deficient performance, there must be a probability that the petitioner's outcome would be different. Id. at 695, 104 S. Ct. at 2068–69. The petitioner seeking release bears the burden of proof regarding both deficient performance and prejudice. Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).

The performance inquiry will generally boil down to whether trial counsel's actions (or inactions) were the result of deficient performance or sound trial strategy. See Strickland, 466 U.S. at 689, 104 S. Ct. at 2065 ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (quoting Michael v. Louisiana, 350 U.S. 91, 101, 76 S. Ct. 158, 164, 100 L. Ed. 83 (1955))). To protect counsel's independence, we start with the strong presumption that trial counsel's performance was constitutionally adequate. Id.

Two principles underlie this presumption. First, the Supreme Court has time and again counseled against judging trial counsel's performance with the benefit of hindsight. Id.; see also Yarborough v. Gentry, 540 U.S. 1, 8, 124 S. Ct. 1, 6, 157 L. Ed. 2d 1 (2003) (per curiam) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."); Bell v. Cone, 535 U.S. 685, 698, 122 S. Ct. 1843, 1852, 152 L. Ed. 2d 914 (2002) (same). Second, trial advocacy is not a science, but an art; there are

17

few "right" answers in the proper way to handle a trial. Strickland, 466 U.S. at 693, 104 S. Ct. at 2067 ("Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.").

This presumption is an evidentiary presumption that carries through the trial. Chandler v. United States, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc). Thus, a petitioner must not present evidence merely to refute the presumption. Rather, the petitioner must present evidence that outweighs the presumed evidence of competence. Kimmelman v. Morrison, 477 U.S. 365, 384 106 S. Ct. 2574, 2588, 91 L. Ed. 2d 305 (1986) ("[T]he defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy."). Therefore, "'where the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.'" Chandler, 218 F.3d at 1314 n.15 (quoting Williams v. Head, 185 F.3d 1223, 1228 (11th Cir. 1999)).

We do not apply fixed or rigid rules when evaluating trial counsel's performance. Strickland, 466 U.S. at 688–89, 104 S. Ct. at 2065. Rather, a petitioner receives ineffective assistance where the representation "[falls] below an objective standard of reasonableness," id. at 688, 104 S. Ct. at 2064,

18

reasonableness being the "prevailing professional norms," <u>Wiggins v. Smith</u>, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535, 156 L. Ed. 2d 471 (2003). To put it another way, trial counsel's error must be so egregious that no reasonably competent attorney would have acted similarly. <u>See</u> <u>Wood v. Allen</u>, 542 F.3d 1281, 1309 (11th Cir. 2008), <u>aff'd</u> 130 S. Ct. 841 (2010) ("[O]ther attorneys might have done more or less . . . or they might have made the strategic calls differently, but we cannot say that no reasonable attorney would have done as [he] did." (quoting <u>Williams</u>, 185 F.3d at 1244)).

## III.

Harvey first claims that his lawyer, Watson, was constitutionally ineffective because he did not attempt to dismiss—either for cause or with a peremptory challenge—a biased juror.

## A.

This claim focuses on Juror Marlene Brunetti. Brunetti was chosen as the first alternate juror, but later replaced a juror excused for illness. During voir dire, Brunetti expressed an ability to be impartial generally, but stated that the news media had influenced her views:

> The Court: . . . . Do you have any difficulty in being an alternate juror?

Mrs. Brunetti: Yes, because of the news media.

. . . .

The Court: And I will explain to the jury all of the laws which apply to this case. Can you follow all of the laws that I'll explain to the jury must be followed and applied by the jury in reaching their verdict if you are a juror and assist in the decision of the case?

Mrs. Brunetti: Yes.

The Court: Is there anything about the charge that's made here where you might find it to be difficult to be fair and impartial because of that charge?

Mrs. Brunetti: No, not with the charge, no.

The Court: . . . . Do you have any biases or prejudices for or against the state or for or against defendants in general that might affect your ability to be a juror here?

Mrs. Brunetti: Only from the news media.

The Court: Do you have any biases or prejudices in general?

Mrs. Brunetti: No.

. . . .

The Court: If you are a juror will you be fair and impartial?

Mrs. Brunetti: Yes.

20

Outside the presence of the seated jurors and prospective alternates, Brunetti explained her knowledge about the crime and her doubt that she could be impartial:

> The Court: . . . . Now, do you know anything about this case other than from news coverage?
>
> Mrs. Brunetti: Just what I read and what I saw on the TV.
>
> . . . .
>
> The Court: What do you recall?
>
> Mrs. Brunetti: Well, I recall that he confessed to doing it and that's why I feel that I couldn't be, you know, impartial about it.
>
> The Court: Why do you think there was a confession?
>
> Mrs. Brunetti: Because I think he did it. I think he did it and he confessed to doing it.
>
> The Court: Why do you think there was a confession? Was that in the news coverage?
>
> Mrs. Brunetti: I think I read that he confessed to it, or I saw it on the TV.
>
> The Court: You know there is more than one person that was charged?
>
> Mrs. Brunetti: Yes, two. There are two.
>
> The Court: What was the name of the person who confessed; do you know that?

21

Mrs. Brunetti: Harvey.

The Court: You're sure of the name?

Mrs. Brunetti: Yes.

. . . .

The Court: What else do you recall about the case?

Mrs. Brunetti: I just recall seeing it and reading it in the paper that two people were murdered.

The Court: Do you recall any of the incidents about the events?

Mrs. Brunetti: That it was a robbery case. They robbed the people . . . .

The Court: What you recall about the case or think you recall about the case, would that affect your ability to be fair and impartial here and confine your decision in the case only to the evidence and the law that I will instruct you?

Mrs. Brunetti: I don't think I could be impartial after reading about it.

. . . .

Mr. Colton[16]: When you read in the paper or saw on the news that he had confessed, did it say in what you saw what it was that it [sic] was in his confession, or just the fact that he had confessed.

Mrs. Brunetti: I think it said that he had confessed to killing them.

Mr. Colton: But did it go into any detail as to what the confession was?

---

[16] State Attorney Bruce Colton.

22

Mrs. Brunetti: I can't remember.  I don't think so.

. . . .

Mrs. Brunetti: Just said that he had signed a confession.  That he had been apprehended.

Mr. Colton: One of the instructions on the law that the Judge will give you is that you're to put aside anything that you read or heard about the case and form your verdict based on the evidence that you heard in the courtroom; could you do that?

Mrs. Brunetti: I don't know if I honestly could.

. . . .

Mr. Watson[17]: What is your present perception as to what happened based upon those articles?

Mrs. Brunetti: Well, I think they broke in, is the best that I can remember, and they robbed them or something and then they were afraid they would be identified and they killed them.

. . . .

Mr. Watson: When you say that you think he did it, do you mean that you think that he shot the people or when you say you think he did it, do you mean you think he committed a certain crime?

Mrs. Brunetti: I feel that he committed the crime that he was charged for.

Mr. Watson: First-degree murder?[18]

---

[17] Harvey's attorney, Robert Watson.

[18]  Here, Watson was repeating what the court informed the venire before the voir dire of individual venire persons commenced.  The court stated:

Mrs. Brunetti: Yes.

Mr. Watson: But the Judge hasn't given you the instructions.

Mrs. Brunetti: I know.

Mr. Watson: But from what all you said up there that's what, you know — you've come to a conclusion as to what first-degree murder is based upon what Mr. Colton and I said?

Mrs. Brunetti: Yes.

Mr. Watson: Do you think that that falls into this category?

Mrs. Brunetti: Yes.

Mr. Watson: Do you feel because Mr. Colton and I may not have explained to you as well as the Judge would later, do you think you could follow the Judge's instructions?

Mrs. Brunetti: I can't honestly say that I could have an open mind after reading it and seeing it on the news. I have to be honest. I wouldn't want to get on the jury and not say what I feel.

Watson also questioned Brunetti about her views of the death penalty and psychology. On the death penalty, Brunetti said, "I'm kind of confused on the death penalty after listening to all of these different people. I think it's a deterrent

---

I read to you from the indictment in this case. . . [T]he State of Florida charges . . . two persons, only one of whom is being tried at this time, . . . that Harold Lee Harvey, Jr. . . . did on the 23d day of February 1985 unlawfully and from a premeditated design to effect the death of W. H. Boyd, . . . did kill and murder him . . . by shooting him with a rifle. That's count 1, that's a charge of murder in the first degree.
. . . .
Again the second charge is a charge of murder in the first degree.

24

because a person would not be able to get out to do the same thing again. But I don't necessarily believe that two wrongs make a right."

On psychology, Brunetti stated that her sister "went to a psychologist for two years" and that "[her sister] was benefitted" by the experience.

Judge Geiger then asked both attorneys if either would care to challenge Brunetti:

> The Court: Motions?
>
> . . . .
>
> The Court: Are there any preemptories [sic]?
>
> . . . .
>
> The Court: These two jurors will be our alternate jurors then?

Immediately after this discussion, Judge Geiger again called the parties to the bench:

> The Court: Just so I understand, there [are] no motions for cause that have been made at this time?
>
> . . . .
>
> The Court: There are no preemptories [sic] at this time?

Watson did not challenge Brunetti for cause, nor did he use a peremptory challenge to remove her. Brunetti was then seated as an alternate. A juror fell ill

and Brunetti became the twelfth juror for Harvey's trial. She voted to convict and for the death sentence.

Harvey's March 11, 1993 Rule 3.850 post-conviction hearing concerned Watson's failure to strike Brunetti. Harvey's post-conviction counsel called James Green, an experienced capital defense attorney, as a witness.[19] Green was critical of Watson's performance in two areas. First, he said that Watson should have asked the venire, Brunetti in particular, more questions regarding how strongly they would weigh a confession. This consideration was vital because, by the time Brunetti was questioned, the court had denied Watson's motion to suppress Harvey's confession. Green's second criticism focused on Watson's strategy. Green stated that he could not "envision any rational trial strategy . . . to justify [Watson's] . . . fail[ure] to challenge Mrs. Brunetti."

Watson testified as a State's witness regarding his overall trial strategy and his specific strategy regarding Brunetti. His overall strategy was driven by the confession; once admissible, Watson believed that conviction was certain and that

---

[19] Harvey's attorney also called Gary Patrick Moran, Ph.D., a psychology professor, to testify regarding the impact a biased juror would likely have on jury deliberations in order to prove Strickland prejudice. However, the court rejected Moran's proffered testimony as irrelevant because Moran could not explain what actually happened inside the jury room in 1986. The propriety of this ruling is not before us here.

Moreover, because the reasonableness of counsel's actions under Strickland is a question of law for the court to decide, expert testimony regarding performance deficiencies carries little, if any, weight. See Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998).

26

"it was a pure [penalty phase] jury." To save Harvey's life, Watson felt he needed to preserve credibility with the jury, which would determine not only Harvey's guilt, but also recommend life or death. In his opinion as a criminal defense expert, Watson stated that it is not a bad strategy to seat a juror biased regarding guilt if the juror could be open-minded during the penalty phase.

Watson could not recall Brunetti's voir dire, nor could he recall his reasons for keeping her on the jury. Presented with the record, he recognized that he "knew that there was not only grounds for cause, but an invitation extended to [Watson by the court] for cause." But, Watson testified, "Obviously I made a decision to keep [Brunetti]. . . . What factors I was considering and which ones I weighed more heavily than others I can't tell you . . . ."

The State Attorney implied one factor—that Watson accepted Brunetti because she was receptive to psychological testimony. Watson intended to call a psychologist during the penalty phase. On the stand, Watson neither confirmed nor denied the implication. Rather, he observed that "she seemed to be certainly not antagonistic to psychologists or psychology."

The court rejected Harvey's argument that Watson's failure to challenge Brunetti constituted ineffective assistance, and denied relief.[20] In its March 17,

---

[20] The court's order also denied relief to Harvey's other claims.

27

1993 order denying relief, the court did not provide reasons for its decision,[21] but, instead, attached a 200 page appendix as support. The only portions of the appendix relevant to Watson's decision to keep Brunetti were six pages of Brunetti's voir dire.

> The Florida Supreme Court affirmed the trial court's order, holding
>
> that there was competent and substantial evidence to support the lower court's finding that defense counsel made a reasonable decision not to challenge Brunetti based on his strategy of attempting to find jurors likely to recommend a life sentence instead of the death penalty. Thus, Harvey has failed to demonstrate that counsel's performance was deficient during the voir dire.

Harvey v. Dugger, 656 So. 2d 1253, 1256 (Fla. 1995).

B.

Harvey claims that Watson's failure to challenge Brunetti either peremptorily or for cause constituted ineffective assistance of counsel. To prevail, Harvey had to prove (1) deficient performance and (2) prejudice. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). The Florida Supreme Court found that Watson's decision was sound trial strategy

---

[21] The order reads:
Ordered and Adjudged . . . . That after an evidentiary hearing on Claim IB. [ineffective assistance of counsel regarding Brunetti] of defendant's motion, the court determines that defendant is not entitled to relief, defendant having neither proven serious errors that denied him of his right to counsel nor actual prejudice that deprived him of a fair trial."

and thus did not consider <u>Strickland</u>'s prejudice prong. <u>Harvey</u>, 656 So. 2d at 1256. Having ruled on the merits of Harvey's claim, the court's ruling receives AEDPA deference and can only be disturbed if it was an unreasonable application of clearly established federal law. <u>See</u> 28 U.S.C. § 2254(d)(1).

As we stated in part II.B, the bounds of constitutionally effective assistance of counsel are very wide. An attorney's actions are sound trial strategy, and thus effective, if a reasonable attorney could have taken the same actions. <u>See, e.g.</u>, <u>Williams v. Head</u>, 185 F.3d 1223, 1244 (11th Cir. 1999). We evaluate juror selection claims as we would any other <u>Strickland</u> claim. <u>See, e.g.</u>, <u>Baldwin v. Johnson</u>, 152 F.3d 1304, 1315–16 (11th Cir. 1998); <u>Smith v. Gearinger</u>, 888 F.2d 1334, 1337–38 (11th Cir. 1989).

1.

Harvey first argues that sound trial strategy can never include seating a biased juror without the defendant's consent. The logic of his argument follows several steps. First, a criminal defendant has a Sixth Amendment right to a trial by an impartial jury. Second, like a guilty plea, the defendant must personally waive this right. Third, counsel's trial strategy is therefore sound only if the defendant personally consents to the seating of the biased juror. Fourth, the record does not show that Harvey consented. Citing a Sixth Circuit decision on point, <u>Hughes v.</u>

29

United States, 258 F.3d 453, 463 (6th Cir. 2001), Harvey claims that his murder convictions cannot stand.

From a first principle, conceding guilt and focusing on the penalty phase is a valid trial strategy for Strickland analysis. With overwhelming evidence of guilt, it is often trial counsel's only chance to spare the capital defendant's life. See Florida v. Nixon, 543 U.S. 175, 191, 125 S. Ct. 551, 562, 160 L. Ed. 2d 565 (2004) ("[A]voiding execution [may be] the best and only realistic result possible" because "[p]rosecutors are more likely to seek the death penalty . . . when the evidence is overwhelming and the crime heinous."); Hightower v. Schofield, 365 F.3d 1008, 1039 (11th Cir. 2004) ("Counsel testified . . . that their strategy was to save Hightower's life, rather than to seek an acquittal. This was a reasonable strategic choice, given that Hightower confessed to the murders . . . ."), vacated and remanded on other grounds, 545 U.S. 1124, 125 S. Ct. 2929, 162 L. Ed. 2d 863 (2005).

Therefore, trial counsel may validly select jurors he or she believes are open to life imprisonment or are receptive to a particular mitigation defense. However, trial counsel must consult with the capital defendant about "questions of overarching defense strategy." Nixon, 543 U.S. at 187, 125 S. Ct. at 560 ("An attorney undoubtedly has a duty to consult with the client regarding 'important

decisions,' including questions of overarching defense strategy." (quoting Strickland, 466 U.S. at 688, 104 S. Ct. at 2052)); see also Hightower, 365 F.3d at 1039 ("Counsel only pursued this sentence-focused strategy after discussing it with Hightower and gaining his approval.").

Harvey's claim fails at this last piece—evidence of consent. Harvey argues that, because the record shows no evidence of consent, we must presume that he never consented. This argument turns the Strickland burden of proof on its head. It is the petitioner's burden to introduce evidence proving trial counsel's deficiency. Kimmelman v. Morrison, 477 U.S. 365, 384, 106 S. Ct. 2574, 2588, 91 L. Ed. 2d 305 (1986); Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).

The record is silent regarding Harvey's consent or lack thereof. The trial court held an evidentiary hearing on March 11, 1993 on the claim that Watson's decision to accept Brunetti constituted ineffective assistance of counsel.[22] Harvey did not testify at the hearing. Watson did, but he was not asked whether he obtained Harvey's consent to Brunetti's selection. The record of the hearing is

---

[22] The March 11, 1993 evidentiary hearing is the only relevant moment for purposes of evaluating Watson's decision to accept Brunetti as a juror. Our task on habeas review is to review the Florida Supreme Court's decision in light of the evidence before it at the time. The court rejected Harvey's Brunetti claim in its 1995 decision, Harvey v. Dugger, 656 So. 2d 1253 (Fla. 1995), at which point, it only had the record of the March 11, 1993 evidentiary hearing before it.

31

accordingly silent on the question of whether Watson discussed his decision to accept Brunetti with Harvey.[23]

With the record silent, we cannot assume that Watson did not consult with Harvey.  See Williams, 185 F.3d at 1228 ("[W]here the record is incomplete or unclear about [trial counsel's] actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment.").  In short, Harvey has not met his burden here.

2.

Harvey next argues that, even if sound trial strategy could encompass seating a biased juror, Watson's testimony at the March 11, 1993 hearing does not demonstrate any strategy.  At the hearing, Watson testified,

> I cannot remember this juror, nor can I tell you what factors I was considering in making the decision to keep her.  Obviously I made a decision to keep her.  Obviously from the record I knew that there was not only grounds for cause, but an invitation extended to me for cause and obviously I made a decision.  What factors I was considering and which ones I weighed more heavily than others I can't tell you at this point.

Harvey argues that this statement is merely "post-hoc speculation," and that we should follow the Fifth Circuit's ruling in Virgil v. Dretke, 446 F.3d 598 (5th

---

[23] Watson's testimony did cover Harvey's consent regarding Watson's opening statement to the jury, another issue in this appeal.

Cir. 2006). In <u>Virgil</u>, trial counsel failed either to question further or challenge two venire persons whose voir dire suggested bias. <u>Id.</u> at 609–10. The Fifth Circuit rejected trial counsel's "conclusory affidavit"[24] (introduced to support counsel's decision) because it "lack[ed] any suggestion of a trial strategy for not using peremptory or for-cause challenges on" the prospective jurors. <u>Id.</u> at 610. The State's explanations were similarly rejected as "after-the-fact justifications" unsupported by the record. <u>Id.</u> at 611.

This argument fails to consider this circuit's evidentiary presumption that counsel acted properly. To give trial counsel proper deference, this circuit presumes that trial counsel provided effective assistance. <u>Williams</u>, 185 F.3d at 1227–28. And it is the petitioner's burden to persuade us otherwise. <u>See Stewart v. Sec'y, Dep't of Corr.</u>, 476 F.3d 1193, 1209 (11th Cir. 2007) ("Based on this

---

[24] The relevant portion of the affidavit read:

> I spent approximately thirty (30) minutes talking to and questioning the jury in this case. I was able to ask all of the questions that I thought were necessary to determine if there was any prejudice or bias against my client. I was also able to question the potential jurors regarding any issues that I thought might arise in this case.
> In determining the final jurors, I used all peremptory strikes that were available to me. I have reviewed the record and confirmed the number of strikes I used in this case. I struck all persons whom I thought had some type of bias, prejudice or issue based upon my voir dire.

<u>Virgil v. Dretke</u>, 446 F.3d 598, 610 (5th Cir. 2006).

strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one . . . .").

Harvey's argument requires us to "turn [this] presumption on its head." Williams, 185 F.3d at 1235. Williams provides a useful analogue. There, the petitioner faulted trial counsel for not recognizing red flags during his investigation for mitigation evidence. Id. at 1234. At the post-conviction hearing—ten years later—trial counsel could not recall his conversations with the petitioner, but assumed that he asked relevant questions. Id. "Given the lack of clarity of the record," the court presumed that trial counsel made the appropriate inquiries. Id. at 1235.

Here, Watson clearly could not recall why he chose to accept Brunetti as a juror. His lack of memory is understandable; the evidentiary hearing occurred nearly seven years after Watson made his decision. Like the petitioner in Williams, Harvey improperly seeks to draw an inference in his favor from Watson's poor recollection.

Reliance on Virgil is misplaced for the same reason. The Fifth Circuit faulted trial counsel's affidavit as "conclusory" and for its "fail[ure] to indicate why for-cause challenges were not used." Virgil, 446 F.3d at 610. This language suggests that the Fifth Circuit's jurisprudence will give the petitioner the benefit of

34

trial counsel's short memory. Binding precedent prevents us from deviating towards such a standard. See Williams, 185 F.3d at 1227–28 ("[W]here the record is incomplete or unclear . . . we will presume that [trial counsel] did what he should have done, and that he exercised reasonable professional judgment."); see also Chandler v. United States, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc).

3.

Finally, Harvey argues that we should not defer to Watson's strategy regarding Brunetti because it "directly undermined several purported strategies that Watson claims he employed during trial." Br. Appellant 39, May 5, 2009.

First, Harvey claims that Watson's Brunetti strategy—selecting a juror likely to vote against the death penalty—conflicted with Watson's strategy of persuading the jury find Harvey guilty of the lesser included offense, second-degree murder. During voir dire, Brunetti stated that she believed that Harvey was guilty of first-degree murder.

Watson testified briefly at the March 11, 1993 hearing[25] about his guilt-phase strategy:

---

[25] The August 1998 evidentiary hearing is immaterial to the outcome of the Brunetti issue. See supra note 22.

> It would be my recollection today that I discussed with [Harvey] what I was going to argue, whether I was going to argue not guilty or a lesser included offense. I would be shocked to learn that we never communicated that. I doubt I went over the specific statements and the opening statement with him.
>
> . . . .
>
> In phase one from reading a bit of the opening that I read, it is obvious that I was arguing for second degree murder rather than first-degree murder which I felt was the only possibility.

But Watson also testified that he did not believe that his second-degree murder argument would persuade the jury. Once the trial court ruled Harvey's confession admissible, Watson believed that he was picking a "pure phase two jury"—phase two being the penalty phase. Because Harvey's confession was "comprehensive," Watson "did[ not] have an expectation of a not guilty verdict."

As a result, Watson—who tried Harvey's case without co-counsel—believed that he needed to "establish credibility with the jury," which would decide Harvey's guilt and recommend a sentence. Without credibility, Watson feared that the jury would find him "insincere" and further harm Harvey's chance for mercy. Watson's testimony does not specifically link "credibility" with his second-degree murder strategy. But his testimony implies that a second-degree murder strategy was the only possible guilt phase argument that acknowledged the validity of Harvey's confession and could avoid a capital murder conviction.

36

According to Harvey, selecting Brunetti—who believed Harvey to be guilty of first-degree murder—directly undermined this guilt-phase strategy of arguing for second-degree murder. Therefore, Watson's purported trial strategy could not have been "sound."

Harvey's argument construes Watson's strategy too narrowly. According to Watson, Harvey's confession doomed any chance for acquittal and nearly any chance of conviction for anything other than first-degree murder. Therefore, his "strategy" was simply to save Harvey's life. In context, it appears that conceding second-degree murder was not a stand-alone strategy, but rather a way to build credibility with the jury. Brunetti's belief that Harvey was guilty of first-degree murder was thus immaterial to Watson's overall strategy to save Harvey's life.

Second, Harvey argues that the Florida Supreme Court's finding that Watson kept Brunetti because she would be receptive to psychological evidence was speculative and therefore erroneous because Watson did not hire a psychiatrist. This argument is also unavailing. Although Watson did not call a psychiatrist, he did call Dr. Frank Petrilla, a psychologist, to provide a character profile of Harvey. Dr. Petrilla testified that, among other things, Harvey had low self-esteem, was a follower, and had poor abstract thinking skills. Someone receptive to psychological testimony might hear this information and view the

37

defendant as worthy of mercy. We thus cannot say that the Florida Supreme Court acted unreasonably in reaching the finding of which Harvey complains.

Lastly, Harvey argues that Brunetti's equivocal statements regarding the death penalty were insufficient to justify Watson's purported penalty-phase strategy. As indicated above, Brunetti explained her view of the death penalty as: "I'm kind of confused on the death penalty after listening to all of these different people. I think it's a deterrent because a person would not be able to get out to do the same thing again. But I don't necessarily believe that two wrongs make a right." Brunetti did not say that she favored the death penalty; neither did she say that she was against the death penalty. While her statements did not strongly support Watson's purported strategy, they did not wholly contradict it either. Strickland requires that we defer to trial counsel's performance and eschew "the distorting effects of hindsight." 466 U.S. at 689, 104 S. Ct. at 2065. With that command in mind, we cannot say that a competent attorney would have inferred from Brunetti's statement a willingness to vote for the death penalty.

We therefore cannot find that the Florida Supreme Court unreasonably applied federal law when it determined that Harvey failed to show that Watson was constitutionally ineffective for accepting Brunetti.

IV.

38

Harvey next argues that Watson was constitutionally deficient for conceding Harvey's guilt to first-degree murder during his opening statement to the jury. The Florida Supreme Court rejected this claim because it found that Harvey could not prove the prejudice prong of Strickland v. Washington, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 2064, 2068, 80 L. Ed. 2d 674 (1984). Harvey v. State, 946 So. 2d 937, 943–44 (Fla. 2006).

A.

On the first day of trial, Watson gave his opening statement to the jury. There, after indicating what the State's evidence would show, he stated that such evidence would establish that Harvey was guilty of second-degree murder. The relevant portion of Watson's opening statement reads:

> Harold Lee Harvey is guilty of murder. If anything is established over the next week, it will be that Harold Lee Harvey is guilty of murder.
> I have been doing defense work for some time. I've never said that in a court of law, that my client is guilty of murder. But he is. That doesn't by any means end your consideration of his case. The physical act that he committed was that he pulled the trigger on what was an automatic military weapon firing it into a room, discharging projectiles that hit human beings and killed them.
> Now, what events lead up to that? What events place this young man in that chair in this room before these 14 people to determine not whether or not he's a murderer but merely what type of murderer he is?
> . . . .

39

But the evidence will show that this case is the story of a robbery, a robbery that went very badly.  I believe the evidence will show that after that robbery was concluded a murder did take place.  A murder took place that was the result of panic, of fear, of depression, of lack of planning, of a depraved mind.

This is the story of how Harold Lee Harvey, Jr. killed Mr. and Mrs. Boyd.

. . . .

And then it happened just about the way that Mr. Morgan[26] said it did.  When they got there Mrs. Boyd surprised them.  She was outside the house.  She was on her way out to get the garbage, they didn't have time to put their masks on.  Mrs. Boyd came up to them, it was, I believe, shortly before nightfall, and asked them at the front door, "What are you doing out here?"  And Stiteler looked at [Harvey] and [Harvey] looked at Stiteler and they knew that things were starting to go wrong.  And they had Mrs. Boyd walk back into the house and Mr. Boyd was in the house and they told them, "We want your money."  And Stiteler ran around the house, all through the house looking for this cache of money, while [Harvey] went into the bedroom with Mr. and Mrs. Boyd.  Mr. and Mrs. Boyd then gave Lee what little bit they had, which was about $30 or $40 at the time.  They didn't have any stash of money there.  And Stiteler never did find the stash of money and they came down and they completed the robbery.  And little facts come out in cases that are always sometimes more indicative of what's really going on and is more indicative about the human beings involved than what the real plan was than other things.  And the little fact in this case is Mr. Boyd asked for money for church, it was Saturday.  And he said, "I have to go to church tomorrow, you're taking all my money."  After all, he's thinking this is the neighbor kid.  I know this kid, he lives over there.  What's this crazy kid doing?  And Lee gave him back money for church, because he didn't plan to kill him.

But then they went outside.  And at that time Stiteler had the imposing weapon and Lee had the handgun.  And at that point they began this frenzied conversation.  They were just outside the home

---

[26]  Assistant State Attorney David Morgan.

40

and the door was half open.  They asked Mr. and Mrs. Boyd to sit down at a card table in the room, and you'll see pictures of the room.

And they had this conversation and without question what was discussed during this conversation was whether or not to kill these two people.  This is a crazy conversation for these two young men to be having but that's what it had gotten to.

In its March 17, 1993 order, the trial court denied, without an evidentiary hearing, Harvey's claim that Watson rendered ineffective assistance by conceding that Harvey was guilty of second-degree murder.  The Florida Supreme Court concluded that an evidentiary hearing was necessary, however, and remanded the claim for that purpose.  Harvey v. Dugger, 656 So. 2d 1253, 1256 (Fla. 1995).

The evidentiary hearing took place in August 1998.  There, Watson testified that his strategy focused on preserving credibility with the jury.  Credibility required a consistent defense between the guilt phase and—because Harvey's confession made acquittal unlikely—the penalty phase.  Conceding second-degree murder achieved this goal.  He also testified that he told Harvey about this strategy.  Harvey took the stand and denied that Watson consulted him about the concession strategy.  Steve Samilow, a member of the team of lawyers who had represented Harvey at the March 11, 1993 hearing, testified that he found nothing in Watson's files indicating Harvey's consent to the strategy.  Andrea Lyon, an expert in defending defendants charged with capital murder, said that merely

41

informing the defendant of a concession strategy was insufficient; an attorney would be unreasonable to infer consent from the defendant's silence.

The trial court again denied Harvey's claim, in its order of January 15, 1999.[27] It found that Watson discussed the strategy with Harvey, that the strategy entailed admitting "some degree of murder if [Harvey's] confession was ruled admissible," that Harvey understood the strategy, and that he therefore consented to it.

As indicated in part I, on appeal, the Florida Supreme Court rendered two decisions regarding this claim. In 2003, the court reversed the trial court and vacated Harvey's convictions and death sentences. Harvey v. State, No. SC95075, 2003 Fla. LEXIS 1140, at *16 (Fla. July 3, 2003). The court found that Watson's opening statement admitted that Harvey and Stiteler discussed whether to kill the Boyds, thus conceding premeditated first-degree murder. Id. at *11. Without Harvey's consent, these statements were the functional equivalent of a guilty plea. Id. As such, Watson's opening statement performance was constitutionally deficient. The court then presumed prejudice under United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), because Watson's

_____

[27] Judge Geiger issued an amended order on January 26, 1999.

42

"performance failed to subject the prosecution's case to meaningful adversarial testing." Id. (citing Atwater v. State, 788 So. 2d 223, 231 (Fla. 2001)).

In 2006, however, the Florida Supreme Court withdrew the July 3, 2003 decision and accompanying opinion in light of Florida v. Nixon, 543 U.S. 175, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004). Harvey v. State, 946 So. 2d 937, 940 (Fla. 2006). According to the court, Nixon precluded Cronic's presumed prejudice in cases involving "counsel's concession of guilt to the crime charged, even without the defendant's consent." Id. at 942. Rather, the petitioner had to prove prejudice under Strickland's second prong. Id.

Applying the Strickland standard, the court found that Harvey failed to show prejudice. Id. at 943–44. According to the court, Watson's guilt-phase defense was based around Harvey's confession, which he knew would be admitted at trial. Id. at 944. Harvey confessed to the murders in great detail, including the conversation about killing the Boyds. Id. Because the jury would have heard this information anyway, there was no reasonable probability that, but for Watson's statements, the jury would have found differently. Id.

In denying Harvey's claim, however, the court held that Watson did in fact concede first-degree murder. Id. at 943. It again pointed to Watson's reference to the conversation between Harvey and Stiteler about whether to kill the Boyds. Id.

43

That language, according to the court, was sufficient to show premeditation, and thus first-degree murder. Id. This concession was of no moment, however, because the court found no prejudice. Id.

## B.

Harvey challenges the Florida Supreme Court's finding of no prejudice and, thus, its denial of his ineffective assistance claim based on Watson's first-degree murder concession. Harvey bears the burden of proving that Watson's concession was objectively unreasonable and that but for the concession, a reasonable probability exists that the outcome of his trial would have been different. See Strickland, 466 U.S. at 687–88, 694, 104 S. Ct. at 2064, 2068. We cannot overturn the Florida Supreme Court's decision rejecting the claim unless we find that it was "contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts," id. § 2254(d)(2).

Harvey first argues that, because he never consented to Watson's first-degree murder concession, we should presume prejudice under Cronic because Watson, in conceding that Harvey was guilty of first-degree murder, "fail[ed] to subject the prosecution's case to meaningful adversarial testing." See Cronic, 466 U.S. at 659, 104 S. Ct. at 2047. The Florida Supreme Court adopted this argument

in its 2003 decision, Harvey, 2003 Fla. LEXIS 1140, at *16, but reversed it in 2006 in light of Nixon, Harvey v. State, 946 So. 2d at 943–44. Harvey claims that Nixon's holding is narrower and only applies where trial counsel discusses his strategy with his client; without consent or discussion, we should presume prejudice. To evaluate Harvey's claim, we must first turn to Nixon.

In Nixon, the defendant, Nixon, was on trial for capital murder. 543 U.S. at 180, 125 S. Ct. at 556. Given Nixon's confession and "overwhelming evidence" of his guilt, id., Nixon's attorney determined that the only way to avoid a death sentence was to concede guilt and focus on the penalty phase, id. at 181, 125 S. Ct. at 557. Trial counsel attempted to explain this strategy to Nixon and gain his consent, but Nixon was uncooperative and was eventually removed from the courtroom. Id. at 181–82, 125 S. Ct. at 557. The Florida Supreme Court vacated Nixon's conviction and sentence after finding trial counsel ineffective for conceding guilt without the defendant's express consent. Id. at 186–87, 125 S. Ct. at 559–60. The court presumed prejudice under Cronic because it found that the concession "allowed the prosecution's guilt-phase case to proceed essentially without opposition" and left the prosecution's case unexposed to "meaningful adversarial testing." Id. at 185, 125 S. Ct. at 559.

45

The United States Supreme Court disagreed. Although the Court acknowledged that criminal defendants must consent to guilty pleas, id. at 187, 125 S. Ct. at 560, it did not find the murder concession to be the functional equivalent of a guilty plea, id. at 188, 125 S. Ct. at 561. "Nixon retained the rights accorded a defendant in a criminal trial. . . . The State was obliged to present during the guilt phase competent, admissible evidence . . . ." Id. Trial counsel did not cede the case; he cross-examined witnesses and attempted to exclude prejudicial evidence. Id. Therefore, Nixon's explicit consent to counsel's concession strategy was not required. Id. at 189, 125 S. Ct. at 561.

Furthermore, the Court held that counsel's performance was not so ineffective as to presume prejudice under Cronic. Id. It explained that "[t]he Florida Supreme Court's erroneous equation of [the] concession strategy to a guilty plea led it to apply the wrong standard in determining whether counsel's performance ranked as ineffective assistance." Id. The Florida Supreme Court did not require Nixon to prove prejudice under Strickland, but rather presumed prejudice under Cronic. Id. The Supreme Court explained, however, that Cronic's presumption was a "narrow exception" to Strickland's prejudice requirement where "counsel has entirely failed to function as the client's advocate." Id. at 189–90, 125 S. Ct. at 561–62. The concession strategy in Nixon

46

did not fall into that category, as trial counsel viewed concession to be the only way to save Nixon's life in the face of the prosecution's overwhelming evidence. Id. at 191–92, 125 S. Ct. at 563.

Harvey argues, though, that Nixon's holding does not apply because Watson never consulted with him regarding a first-degree murder concession. He points to language in Nixon implying that consultation is required to shift from Cronic's presumed prejudice to Strickland's prejudice showing. The relevant language in Nixon reads: "But when a defendant, informed by counsel, neither consents nor objects to the course counsel describes . . . counsel is not automatically barred from pursuing that course." Id. at 178, 125 S. Ct. at 555. According to Harvey, Nixon is a narrow holding that, where trial counsel concedes the charge in an opening statement, courts must presume prejudice under Cronic unless "(1) the attorney fulfills the obligation of consulting with the client about the strategy and asking for consent and (2) the client does not approve or reject the strategy because the client is silent or uncooperative." Br. Appellant 50.

The failing of Harvey's argument lies not with its logic, but with the deference we must afford the Florida Supreme Court under AEDPA. Under AEDPA, we can grant Harvey's request only if that court's holding was "unreasonable." See 28 U.S.C. 2254(d)(1) ("A . . . writ of habeas corpus . . . shall

47

not be granted . . . . unless the adjudication of the claim resulted in a decision that . . . involved an unreasonable application of[] clearly established Federal law . . . .").

Nixon can be read in two equally compelling ways.  On one hand, Harvey's quoted text does suggest that consultation could be the key fact that requires Strickland prejudice to be presumed under Cronic.  On the other hand, the Court emphasized the distinction between a guilty plea and a concession strategy: "The Florida Supreme Court's erroneous equation of [the] concession strategy to a guilty plea led it to apply the wrong standard in determining whether counsel's performance ranked as ineffective assistance."  Nixon, 543 U.S. at 189, 125 S. Ct. at 561.  This quoted language suggests that consent is irrelevant for determining whether the prejudice component of an ineffective assistance claim is governed by Cronic's or Strickland's standard.

The Florida Supreme Court employed the latter standard.  With two equally compelling readings available, we cannot conclude that the court was unreasonable for choosing one reading over the other.

Furthermore, Cronic's presumed prejudice standard is only available in extreme circumstances where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing."  Cronic, 466 U.S. at 659, 104 S. Ct. at

2047. The "failure must be complete. . . . [C]ounsel [must] fail[] to oppose the prosecution throughout the . . . proceeding as a whole," rather than merely "at specific points" in the proceeding. Bell v. Cone, 535 U.S. 685, 697, 122 S. Ct. 1843, 1851, 152 L. Ed. 2d 914 (2002). Cronic itself did not find defense counsel constitutionally deficient even though counsel was a real estate attorney appointed to defend a complex mail fraud case with only twenty-five days to prepare a defense. 466 U.S. at 663, 104 S. Ct. at 2049; see also Nixon, 543 U.S. at 190, 125 S. Ct. at 562 (describing the counsel in Cronic as "an inexperienced, underprepared attorney in a complex mail fraud trial").

Rather, the Cronic Court pointed to Powell v. Alabama, 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158 (1932), as a useful case in point. 466 U.S. at 660–61, 104 S. Ct. at 2047–48. In Powell, an out-of-state lawyer was appointed on the same day as the defendants' rape trial even after the lawyer informed the court that he was neither aware of the facts nor familiar with local procedure. 287 U.S. at 55, 53 S. Ct. at 59. Powell thus presented an example where "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual

49

conduct of the trial." Cronic, 466 U.S. at 559–60, 104 S. Ct. at 2047. Watson's performance clearly met that low bar.[28]

In sum, the Florida Supreme Court's refusal to determine Strickland prejudice under Cronic's presumed prejudice standard did not constitute a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).

Thus, because he cannot rely on Cronic's presumed prejudice, Harvey must show that, but for Watson's first-degree murder concession, there is a reasonable probability that the outcome of his trial would have been different. Strickland, 466 U.S. at 695, 104 S. Ct. at 2068–69. The Florida Supreme Court found that Watson's opening statement merely restated facts that the jury would soon hear when the State introduced Harvey's confession into evidence. Harvey, 946 So. 2d at 943–44. Therefore, according to the court, even without Watson's opening statement, including the murder concession, the jury still would have heard that Harvey and Stiteler conferred about whether to kill the Boyds, after which Harvey shot and killed them. Id.

---

[28] Putting aside his opening statement to the jury, Watson's performance throughout trial was not such that he effectively ceased to represent Harvey. Watson contested the admission of Harvey's confession, cross-examined witnesses, and objected to prejudicial evidence he thought was inadmissible. Considering the record as a whole, we cannot say that Watson "entirely failed" to contest the prosecution's case against Harvey.

50

We cannot say that the Florida Supreme Court's Strickland finding of no prejudice constituted "an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). The State's evidence against Harvey was overwhelming and included his own confession. Under such circumstances, it would be very difficult to see how the outcome of the trial would have been different had Watson not conceded Harvey's guilt, as charged in the indictment. See Nixon, 543 U.S. at 192, 125 S. Ct. at 563 ("[C]ounsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in 'a useless charade' [by failing to concede overwhelming guilt]." (quoting Cronic, 466 U.S. at 656 n.19, 104 S. Ct. at 2046 n.19)).

Harvey attempts to point us away from this conclusion. His first argument for actual prejudice restates his argument that Cronic's presumed prejudice should apply. As we explained, Cronic's presumed prejudice only applies where trial counsel entirely failed to challenge the prosecution's case; Watson's performance does not fall within that category.

Second, Harvey argues that Watson's closing statement during the penalty phase conceded the aggravating factors at issue. This argument has two fatal flaws. For one, Harvey did not mention this claim in his motion for a certificate of appealabilty. Thus, the district court's certificate of appealability did not authorize

51

Harvey to appeal the claim. The other flaw is that this prejudice argument does not address the prejudice suffered because of Watson's concession of guilt. Rather, it points out a completely separate performance error—admitting aggravating factors—and attributes the possible prejudice from that error to Watson's guilt concession. This is not proper Strickland analysis. Harvey must show prejudice flowing from Watson's concession of guilt, which he has not done.

Third, Harvey attempts to show prejudice by pointing to his attorney's "endorsement" of legal conclusions—"'guilty,' 'murder,' 'premeditation,' 'robbery,' 'burglary,' and 'kidnaping.'" But, Harvey does not explain how these concessions caused actual prejudice. He cites Frances v. Spraggins, 720 F.2d 1190 (11th Cir. 1983), for the proposition that defense counsel's personal belief about guilt is necessarily prejudicial. Spraggins, however, concerned a very different circumstance. There, the capital defendant denied his involvement in the crime and took the stand, testifying to that end. Spraggins, 720 F.2d at 1194. His attorney, however, undermined his testimony by saying that he believed the defendant to be guilty. Id. Nothing of the sort happened here. Harvey confessed to the facts Watson laid out in his opening statement; restating these facts could not have undermined Harvey's non-existent trial testimony.

Within this argument, Harvey cites Watson's references to his "evil" actions, referring to the murder as "repulsive" and "the product of a depraved mind." This argument fails for the same reason as his second prejudice argument—it refers to a separate performance deficiency. The deficiency at issue is Watson's concession of guilt. These failures—"evil," "depraved," and "repulsive"—are not poor consequences that flowed from Watson's concession. They allege separate episodes of allegedly ineffective assistance of counsel.

Furthermore, Harvey takes Watson's words out of context. In their proper context, each word forms part of a coherent strategy. "Evil" referenced what was set in motion by Harvey and Stiteler's botched robbery—clearly an attempt to foreshadow that events were going to spiral beyond Harvey's control. "Repulsive" referred to murder, generally, followed by a plea to the jury not to "let that repulsion carry into their deliberations and affect their decision-making process as to what type of murder this was." "Depraved" referred to the mens rea for second-degree murder.

Finally, Harvey argues that he was prejudiced by Watson's attempt to "distance" himself from his client. This argument again mixes analytical steps; this is not prejudice flowing from Watson's concession of guilt.

53

For the foregoing reasons, we reject Harvey's claim that the Florida Supreme Court's no prejudice finding was based on an "unreasonable" factual determination "in light of the evidence presented" at Harvey's trial. 28 U.S.C. § 2254(d)(2).[29]

V.

We turn now to Harvey's final two claims: Watson was deficient for failing properly to investigate mitigation evidence regarding both his client's personal history and mental health. Like all claims of ineffective assistance of counsel, Harvey must prove deficient performance and resulting prejudice. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). Harvey contends that, with respect to both kinds of mitigation evidence, Watson's pretrial investigation was markedly deficient. In his view, an adequate pretrial investigation would have led to a different mitigation strategy for the penalty phase of the trial, one that would have produced a different outcome—a life sentence rather than the death penalty.

We first consider, in subpart A, Watson's performance relating to Harvey's personal history, then, in subpart B, Harvey's mental health. In the end, we reject

_____

[29] The no prejudice finding is a finding of ultimate fact—an inferred fact. In concluding that the finding was not unreasonable, and therefore entitled to AEDPA deference, we also conclude that the subsidiary fact findings, those which yielded the ultimate fact, were similarly not unreasonable.

54

Harvey's argument that the Florida Supreme Court unreasonably found that Watson's investigation into these areas of mitigation was objectively reasonable under Strickland's performance standard. See 28 U.S.C. § 2254(d)(1), (2).

A.

1.

Watson's penalty phase strategy was to portray Harvey as a good person worthy of saving and to convince the jury that the murders were an aberration from his otherwise amiable nature. To that end, he called sixteen witnesses. His mother, father, two sisters, brother, uncle, as well as several friends, several family friends, his work supervisor, a co-worker and two teachers testified. The Florida Supreme Court, in Harvey v. State, capsulized Watson's strategy by adopting the trial court's description of what Watson presented:

> Evidence was also presented that he was hard-working, from a good, decent family who would be negatively effected [sic] if he would be executed, that he had been a loving brother to his disabled sister, that the crime was out of character, and that he was pressured by his wife to provide things he could not financially do. Evidence showed that he was involved in the fatal accident at age 16 and would be able to adapt to a life sentence in prison.

946 So. 2d 937, 947–48 (Fla. 2006). In addition to this, the court noted that "[t]he jury viewed several childhood photographs of Harvey with his siblings, as well as home movies of various family outings." Id. at 948.

55

In his August 27, 1990 motion for post-conviction relief, Harvey claimed that Watson's investigation into his personal history, and therefore Watson's penalty phase strategy, was constitutionally insufficient. The trial court denied the claim without an evidentiary hearing. The Florida Supreme Court vacated the ruling and remanded the claim for an evidentiary hearing. Harvey v. Dugger, 656 So. 2d 1253, 1257 (Fla. 1995).

As indicated in part I, the evidentiary hearing was held in August 1998. Harvey's attorneys called several witnesses. Some recounted Harvey's personal history. Others testified that, but for Watson's deficient investigation, an accurate personal history would have been revealed and presented to the jury during the penalty phase of the trial.

Harvey's family members, many of whom also testified at Harvey's trial, said that the questions Watson asked them pertained only to the positive aspects of Harvey's life and family situation. Harvey's father said that Watson gave him the questions Watson would ask and the answers he should give. Other family members said they would have told Watson the grittier aspect of Harvey's life had Watson asked. One sister said that Watson directed her testimony—only to say "yes, sir" and "no, sir." The other sister explained that she was not eager to tell Watson about her family's "dirty laundry."

56

The personal history the family witnesses gave portrayed an entirely different picture of Harvey's life than the one Watson presented to the jury. Harvey's parents and siblings testified that the family grew up in poverty; the children and their mother picked fruit on the weekends to survive; there was not enough to eat growing up; the children rarely had medical care; Harvey's father was an alcoholic who would hit Harvey with a stick when he would drink; Harvey once physically separated his parents when Harvey's father was beating Harvey's mother; and that the family never expressed love or affection for each other. Two family members, however, did state that Harvey's parents loved him.

Harvey was involved in a fatal automobile accident at age sixteen. Family members emphasized the impact the accident had on Harvey's subsequent behavior. One sister testified to the gruesomeness of the accident and described Harvey's hospital-bed appearance in detail. Following the accident, Harvey had nightmares, exhibited noticeable personality changes, seemed to have "his mind somewhere else" at times, and exhibited wild mood swings and reckless behavior.

Family members related three incidents of violent behavior they attributed to the accident. The first involved Harvey driving a truck, with his sister in the passenger seat, into on-coming traffic, veering just in time to avoid a crash. The second incident consisted of Harvey choking the same sister during something

57

akin to a black-out. The third incident involved Harvey shooting out a street light with a weapon.

Members of the family also described Harvey's chronic abuse of drugs and alcohol. Harvey used alcohol at an early age; one member said that Harvey's step-grandfather gave him alcohol during his pre-teen years.

Joseph Krumey, Jr., Watson's first private investigator, testified that Watson hired him in May 1985 to find evidence of "redeeming social qualities." According to the testimony, Krumey did not perform the investigation himself; instead, he hired a former FBI agent to conduct the investigation. Krumey was not certain whether it was he or the former agent who met with Watson during the five months the investigation proceeded. Watson fired Krumey in October 1985 after performing roughly twenty hours of work.[30]

Andrea Lyon, a clinical professor of law, testified as an expert on how to investigate a capital case. She said that defense counsel should interview the potential witnesses in person because the best mitigation evidence—for example, parental abuse of the defendant as a child—is usually embarrassing. It frequently takes between three and six interviews of family members before they reveal the

---

[30] Krumey testified that he charged $35/hour and was paid $750 for his work.

58

truth about the defendant's upbringing.  Until they are willing to open up, the family is likely to provide only positive information.

Watson appeared at the hearing as a witness for the State, and covered several points.  Although he was unsure of the date, he said that he initially gave Krumey instructions to look for witnesses who could testify regarding Harvey's "redeeming social qualities."[31]  Watson added that he was displeased with Krumey's work, so, in October 1985, he fired him and hired a second investigator.

Watson further testified that he met with members of Harvey's family on several occasions, and acknowledged that, as it turned out, his penalty phase strategy coincided with the image he formed of the family after meeting them over dinner.  He rejected Harvey's attorneys' assertion that he formed his strategy prematurely, before Harvey's  background investigation was finished.  When asked whether he had received information to the effect that Harvey was a drug user or had been subjected to domestic abuse as a child, Watson answered in the

[31]  Although Watson could not recall when he hired Krumey, the record, including Krumey's testimony, indicates that he hired Krumey shortly after he was appointed to represent Harvey, and that Krumey and the former FBI agent Krumey assigned to the case worked for Watson for five to six months, until October 1985.  During that time, if the $750 ($35 per hour) Krumey billed Watson is an accurate indication of the amount of investigative work he and the former agent performed, one would have to conclude that they did accomplish very little—which was why Watson, with the court's permission, employed the second investigator at the State's expense.

Steve Samilow, an early member of Harvey's post-conviction team of lawyers, testified that his examination of Watson's files indicated no "extensive evidence of mitigation investigation."

59

negative.[32]  He said that if he had he been given such information, he would not have presented it to the jury—evidence of drug use or child abuse would have undermined his strategy, requiring the development of a completely different theme than the "aberration" theme he chose.

After receiving the parties' evidentiary submissions, the trial court rejected the claim that Watson's investigation into Harvey's personal history was objectively deficient, that a reasonably competent attorney would have uncovered the information Harvey's family members disclosed at the hearing and would have presented it to the jury.  The court noted that Watson's mitigation strategy emphasized Harvey's positive attributes, and that the new evidence Harvey's attorneys presented would have undermined the "good person" defense Watson was portraying.  In the court's view, counsel were asking the court to speculate as to whether their proffered strategy might have been more effective than Watson's.  The three incidents of violent behavior—playing chicken, choking, and shooting the street light—counsel considered to be a mitigating factor might, in the court's view, harm Harvey's case after being subject to the State's cross-examination.

---

[32]  Neither Harvey nor the State called Watson's second investigator as a witness.  In saying that he received no information regarding drug use or domestic abuse, the inference is that neither the family members with whom Watson had conversations nor the second investigator said anything that would lead Watson to believe that Harvey had a history of drug use or had been the victim of domestic abuse.

The Florida Supreme Court affirmed the trial court's rejection of Harvey's claim that Watson's personal history investigation fell below Strickland's reasonably-competent-attorney standard. It found that "[t]he record clearly demonstrate[d] that counsel conducted an adequate investigation into Harvey's background . . . ." Harvey, 946 So. 2d at 948.

## 2.

Harvey disagrees with the Florida Supreme Court's finding. He argues that Watson's investigation of potential mitigating evidence was constitutionally deficient and that a proper investigation—one performed by a reasonably competent attorney—would have uncovered evidence painting a vastly different, and stronger, mitigation picture.

Strickland governs trial counsel's investigation of mitigating evidence:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690–91, 104 S. Ct. at 2066. Therefore, Harvey bears the burden of proving that Watson unreasonably limited his investigation. The fact that Watson was unaware of particular facts is immaterial if he conducted a reasonable investigation.

Harvey must also overcome the deference we afford the Florida Supreme Court. Harvey cannot obtain habeas relief unless the Florida Supreme Court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented," id. § 2254(d)(2).

The core of Harvey's argument is that Watson approached his client's penalty phase defense with a preconceived strategy—the "good person" strategy—and only sought evidence to support that strategy. After reviewing the August 1998 evidentiary hearing before the trial court, we cannot conclude that the Florida Supreme Court's decision that Watson conducted an adequate investigation was based on an unreasonable determination of the ultimate fact.

Three sets of witnesses testified to Watson's investigation: Krumey, the investigator; Harvey's family members; and Watson. Krumey's testimony shed no light on the investigation that actually occurred. Krumey admits that he did not

actually perform the investigation; he passed off that task to a former FBI agent. Furthermore, Watson clearly did not approve of the work Krumey had done; Watson fired him in October 1985. What Watson's second investigator found is unknown—because he was not called to testify at the evidentiary hearing. Also unknown is what that second investigator may have told Watson—because neither side asked Watson what he said.

Harvey's family members likely had questionable credibility with the finder of fact—the trial court. Many of the same witnesses testified to completely different sets of facts during Harvey's 1986 trial. It would be entirely reasonable to discount their credibility based on their inconsistent testimony and current motive to lie to save Harvey's life.

Watson testified that he hired two private investigators and also spoke with the family personally. He claims that the "good person" defense was not cut from whole cloth, but rather resulted from his investigation. That he did not learn about Harvey's physical abuse or substance abuse says nothing about the quality of that investigation.

These pieces together do not satisfy Harvey's burden of proving that Watson's investigation was deficient. Nor do they allow us to conclude that the Florida Supreme Court was unreasonable in denying Harvey's claim.

63

Against this conclusion, Harvey presents several arguments. Harvey first claims that Watson did not follow the guidelines of the 2003 American Bar Association Standards for Criminal Justice—that he should have interviewed "virtually everyone else who knew [Harvey] and his family." Br. Appellant 58 (quoting ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.7, Commentary (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913, 1024 (2003)). This standard is an inappropriate metric for judging Watson's performance. Although the ABA standards provide useful guideposts, see Strickland, 466 U.S. at 688, 104 S. Ct. at 2065, they are only relevant "to the extent they describe the professional norms prevailing when the representation took place." Bobby v. Van Hook, 130 S. Ct. 13, 16, 175 L. Ed. 2d 255 (2009) (per curiam). Norms from 2003 are irrelevant when judging a representation from 1985–1986.

Instead, the relevant ABA standards are more general. The 1982 Standards for Criminal Justice issue a broad "duty to investigate," the relevant portion of which says: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." 1 ABA

Standards for Criminal Justice 4-4.1 (2d ed. 1982). Harvey has not proven that Watson's investigation fell short of this standard.

This is not a case where trial counsel ignored obvious red flags or overlooked documents he had a duty to consult. Harvey argues that his case is analogous to several Supreme Court decisions, Rompilla v. Beard, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005); Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003); Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); and one from this circuit, Williams v. Allen, 542 F.3d 1326 (11th Cir. 2008). As we explain, however, none of these cases apply.

In Rompilla, the Supreme Court found trial counsel ineffective because he did not investigate mitigating evidence available in a court file from one of the habeas petitioner's prior convictions. 545 U.S. at 383, 125 S. Ct. at 2464. The file would have raised red flags leading to evidence of drinking, alcoholic parents, and childhood beatings. Id. at 391–92, 125 S. Ct. at 2468. Although superficially similar to Harvey's claim, Rompilla's holding is narrow and inapplicable. There, trial counsel was required to read the court file only because he knew that the prosecution would introduce the petitioner's prior convictions; therefore, he

65

should have read the file to anticipate the State's argument. Id. at 383–84, 125 S. Ct. at 2464. Nothing similar occurred in Harvey's case.

Trial counsel in Wiggins likewise ignored a readily available document that noted the petitioner's "misery as a youth" and would have led to extensive mitigation evidence. 539 U.S. at 523–25, 123 S. Ct. at 2536–37. This failure coincided with counsel's general failure to investigate or prepare a social history report, the standard practice at the time. Id. Wiggins contrasts with Harvey's case because counsel in Wiggins both failed to investigate and had key leads in documents before him. Watson faced nothing as glaring in readily-available files.

Taylor also presented a case where trial counsel failed to find available files showing a "nightmarish childhood," imprisoned parents, and frequent beatings. 529 U.S. at 395, 120 S. Ct. at 1514. Counsel's insufficient investigation—begun only one week before the trial—failed to uncover these red flags. Id. Again, Harvey's case presents neither a failure to investigate nor readily-available documents that would necessarily have led to the mitigation evidence Harvey presented at the August 1998 evidentiary hearing.

Finally, trial counsel in Allen overlooked evidence in an available report of a low IQ, personality disorder, and evidence of childhood abuse. 542 F.3d at 1339. The evidence contrasted with the penalty phase testimony, during which the

66

petitioner's mother—the only witness trial counsel interviewed during his investigation—provided mild testimony regarding beatings administered by the petitioner's father. Id. at 1329, 1339. This limited interview fell short of professional standards including the need to verify information, id. at 1339 (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.41(D) (1989)), which particularly hurt the petitioner because it turned out that his mother also abused him, id. at 1332. Watson, in contrast, did not limit his sources—he called sixteen personal-history mitigation witnesses. Furthermore, Harvey has not presented sufficient evidence to give an idea of what investigation actually took place. And, what evidence he did present, the trial judge was not required to find credible.

We therefore cannot conclude that the Florida Supreme Court's finding that Watson conducted an objectively reasonable investigation into Harvey's personal history constituted an unreasonable finding of fact, a finding not entitled to AEDPA deference. 28 U.S.C. § 2254(d)(2).

## B.

Harvey's last claim argues that Watson did not conduct an effective mental health investigation. Specifically, he points to Watson's failure to hire a psychiatrist—as opposed to a psychologist—to interview Harvey and testify at

67

trial. Again, Harvey bears the burden of proof. He must show that Watson's decision not to hire a psychiatrist was deficient, falling below professional norms, and that Watson's failure prejudiced Harvey's defense against the death penalty. Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.

1.

After the trial court appointed Watson to defend Harvey, Watson moved the court for funds to hire both a psychiatrist and psychologist. The court granted Watson's motion and subsequent motions for funds.

With those funds, Watson hired Dr. Fred Petrilla, a psychologist with a Masters in counseling psychology from West Virginia University and a Ph.D in psychology from the University of Kentucky. At the time of trial, Dr. Petrilla had seen patients for eight years. He primarily worked as a school psychologist; the majority of his practice concerned adolescents and older adolescents. He had served as an expert witness in civil and criminal cases, though never on behalf of a defendant in a murder trial.

Dr. Petrilla interviewed Harvey in the Okeechobee County jail in June 1985. There, he administered a battery of personality tests.[33] He also conducted a background investigation and spoke with Harvey's teachers and family.

Watson called Dr. Petrilla in Harvey's penalty phase defense. He testified regarding the various tests he performed. From these tests, Dr. Petrilla concluded that Harvey was "very dependent and depressed," "immature," and had chronic depression. Harvey, according to Dr. Petrilla, also had poor concrete reasoning, which meant that he was unable to plan effectively his actions and when placed under stress, would be an even more rash thinker. Furthermore, Dr. Petrilla diagnosed Harvey with "dysthmic disorder, chronic depressive reaction and dependent personality disorder." He focused on these "emotional disorders" because the tests did not indicate brain damage—that is, damage to the frontal lobes. Dr. Petrilla did not attempt to use these diagnoses to explain Harvey's behavior or thinking at the time of the murder. When asked, he said, "no, I'm just here to explain the test results."

Based on this testimony, the trial court, in sentencing Harvey, found non-statutory mitigating factors regarding Harvey's low IQ, low self-esteem, poor

---

[33] Dr. Petrilla stated that he performed the following tests on Harvey: Bender Visual-Motor Gestalt test, Draw-A-Family, Draw-A-Person, Fundamental Interpersonal Relations test, House-Tree test, and the Minnesota Multiphasic Personality Inventory.

69

education, poor social skills, and inability to reason abstractly. However, these mitigating factors did not outweigh the aggravating factors, and Harvey was sentenced to death.

Harvey's August 27, 1990 motion for post-conviction relief included the current claim that Watson's mental health investigation was constitutionally ineffective. The trial court rejected the claim on March 17, 1993 without an evidentiary hearing. In 1995, the Florida Supreme Court vacated the decision and remanded the claim to the trial court for an evidentiary hearing. Harvey, 656 So. 2d at 1257. The trial court held that hearing in August 1998.

At the evidentiary hearing, several witnesses testified regarding Watson's mental health investigation. Watson testified that he sought court funds for both a psychologist and a psychiatrist because it was "necessary to have both [exams] to get a total picture." Regarding his preparation of Dr. Petrilla, he instructed Dr. Petrilla not to speak with Harvey about the circumstances of the crime because he was afraid of the State using this information against the defense on cross-examination.

Watson conceded that Dr. Petrilla suggested that he hire a psychiatrist to confirm his findings and that he wrote himself a note to call a psychiatrist. Watson did not contact a psychiatrist, however, because he feared he would lose

70

the jury by calling two mental-health experts during the penalty phase. Watson believed that juries are pre-disposed to disbelieve psychological testimony in criminal cases; calling multiple experts might seem a "thin excuse" because Harvey did not have a documented history of mental illness.

Dr. Michael Norko, a psychiatrist, testified for Harvey. Dr. Norko examined Harvey in connection with the post-conviction process—once in April 1990 and once in April 1996. Unlike Dr. Petrilla, who did not examine the facts of the crime and Harvey's background before interviewing Harvey, Dr. Norko, before he examined Harvey, read through the post-conviction affidavits and various records to learn about Harvey's life and his case.

Based on what those materials disclosed and his examination of Harvey, Dr. Norko made several diagnoses that overlapped Dr. Petrilla's penalty phase testimony—including depression, low IQ, poor abstract thinking, dependent personality disorder, and post traumatic stress disorder. Dr. Norko disagreed with Dr. Petrilla regarding the existence of brain damage—Dr. Norko found evidence of organic brain disorder. He gleaned this from a mixture of test results and evidence of head trauma from Harvey's car accident and subsequent head injuries. Dr. Norko did not subject Harvey to a CAT, MRI, or EEG scan because these tests do not always perceive organic brain dysfunction. Finally, Dr. Norko testified that

71

Harvey's condition satisfied three statutory mitigation factors: (1) lack of capacity to appreciate the criminality of his conduct; (2) duress or substantial domination by both Harvey's wife and accomplice Stiteler; and (3) extreme mental or emotional disturbance.

Andrea Lyon, Harvey's criminal defense expert, testified that Watson should have had a psychiatrist examine Harvey. Dr. Petrilla was a clinical psychologist, but had no forensic expertise. She also could not understand why Watson did not allow Harvey to speak about the crime with a mental health expert. Based on Harvey's medical reports—particularly following Harvey's car accident—Lyon claimed that Watson should have noted red flags regarding possible brain damage. On cross-examination, however, the State pointed out that the medical records also indicated that, following his car accident, Harvey was responsive, needed only four stitches, and received no special treatment regarding his loss of consciousness.

Harvey called a second psychiatrist, Dr. Brad Fischer. Dr. Fischer examined Harvey in April 1990 and performed a battery of psychological tests similar to those Dr. Petrilla had performed prior to Harvey's trial. He came to the same conclusions as Dr. Norko. Dr. Fischer also faulted Dr. Petrilla's investigation and report. He did so primarily because Dr. Petrilla's professional

experience focused on counseling; he lacked experience as a forensic examiner. In his opinion, Dr. Petrilla's lack of experience was exacerbated by Watson's failure to provide Dr. Petrilla with all of Harvey's background materials. Furthermore, Dr. Petrilla was not properly alerted to the possibility of brain damage because the background materials he had at hand did not mention Harvey's car accident or other head traumas. Dr. Fischer also noted "scoring errors" in Dr. Petrilla's evaluation that undermined Dr. Petrilla's ability to spot Harvey's brain damage.

Dr. Petrilla also testified about his initial evaluation and Watson's performance. Regarding Watson's investigation, Dr. Petrilla testified that Watson asked him only to administer a personality evaluation, distinct from a forensic evaluation, which he stated tested different areas of the brain. In his estimation, he could not have performed a forensic evaluation in 1985 because he was incompetent to do so then. Dr. Petrilla complained that Watson failed to provide him with Harvey's background information. Although he did not want these facts before seeing Harvey, he felt they would have been useful when interpreting the results.

Regarding organic brain damage, Dr. Petrilla testified that he told Watson that he did not think Harvey had brain damage. In retrospect, however, he did so

73

only because he did not have sufficient experience to link Harvey's test results with signs of organic brain damage. It was this lack of competence that led him to suggest that Harvey see a psychiatrist, who not only could provide a second opinion, but also would be more thorough regarding likelihood of organic brain damage. However, Dr. Petrilla did not tell Watson that he was incompetent to render an opinion about the possibility of brain damage.

After hearing Harvey's evidence, the trial court denied Harvey's claim. The court concluded that Dr. Petrilla did test for organic brain damage and found none, but that he did recommend that Harvey see a psychiatrist to verify his opinion and diagnoses. Watson chose not to consult a second expert because he feared that conflicts between two experts might cause the jury to disregard all mental health evidence and that calling two mental health experts would anger the jury as a "bad excuse for bad behavior."

The court noted that Dr. Petrilla told Watson that Harvey did not have brain damage but suffered from a personality disorder. The court discounted the uncovered evidence of brain damage because the post-conviction experts "concede that there is no expert proof of any particular cause of brain damage." The court concluded that Harvey had not shown that Watson "fail[ed] to ensure a competent mental health examination."

The Florida Supreme Court agreed. Harvey, 946 So. 2d at 945–47. Its 2006 opinion found that Watson's performance satisfied Strickland's performance standard, contrasting Watson's investigation with those in which trial counsel "never attempted to meaningfully investigate mitigation." Id. at 946 (quoting Rose v. State, 675 So. 2d 567, 572 (Fla. 1996)). The court found that Watson "conducted a reasonable investigation into Harvey's mental health background and incorporated his findings into a penalty phase strategy." Id. at 947.

2.

Harvey argues that the post-conviction evidence he presented proved that Watson was deficient in failing to contact a psychiatrist, and that Watson's failure to present such evidence to the jury prejudiced Harvey's defense. Framed under Strickland, Harvey's argument is that Watson's investigation fell below an objective standard of professional conduct. See Strickland, 466 U.S. at 690–91, 104 S. Ct. at 2066. Moreover, because the Florida Supreme Court found Watson's investigation objectively reasonable, Harvey must demonstrate that the court's finding constituted an "unreasonable determination of" fact. 28 U.S.C. § 2254(d)(2).

A thorough post-conviction mental health investigation does not render trial counsel's less thorough investigation ineffective. Johnson v. Upton, 615 F.3d

75

1318, 1337 n.17 (11th Cir. 2010). The key factor is whether the "known evidence would lead a reasonable attorney to investigate further." Powell v. Allen, 602 F.3d 1263, 1273 (11th Cir. 2010) (quoting Wiggins, 539 U.S. at 527, 123 S. Ct. at 2538). "[T]he mere fact [that] a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial." Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1242 (11th Cir. 2010) (quoting Davis v. Singletary, 119 F.3d 1471, 1475 (11th Cir. 1997)).

Harvey presses two main arguments against the Florida Supreme Court's finding that Watson's mental health investigation was objectively reasonable. First, he argues that Watson was deficient for failing to follow Dr. Petrilla's advice to follow-up with a psychiatrist. We cannot accept this argument because of the deference we must show not only to Watson's professional judgment, but also to the Florida Supreme Court's finding of reasonableness under AEDPA.

Strickland allows attorneys to limit investigations if it would be reasonable to do so. 466 U.S. at 690–91, 104 S. Ct. at 2066. Watson was told by his expert, Dr. Petrilla, that Harvey did not have brain damage.[34] Although Dr. Petrilla

---

[34] Harvey's brief to this court suggests that, in 1985, Dr. Petrilla noted test results indicative of brain damage and suggested that Harvey see a psychiatrist because of his inexperience in neuropsychology. Br. Appellant 5. Dr. Petrilla's testimony does not paint nearly as explicit a picture as does Harvey's brief. Dr. Petrilla never expressed his competency

76

claimed incompetence in his post-conviction testimony, he did not express that view to Watson in 1985, prior to Harvey's trial. Rather than obtain a second opinion, Watson chose to rely on his expert, who gave him no reason to doubt that he was competent. We cannot say that Watson's performance was deficient. And we certainly cannot say that the Florida Supreme Court's finding constituted an unreasonable assessment of the evidence bearing on Watson's performance.

Harvey's second argument is that Watson's own familiarity with the case should have raised red flags sufficient to justify a more thorough mental health evaluation. Specifically, Harvey points to Watson's observations that "Harvey was a 'borderline operator,' suicidal, slow to understand and tearful." This argument, however, is just another way of arguing Harvey's first point. Watson must have been concerned for Harvey's mental health—he hired Dr. Petrilla. Harvey's argument would require Watson to give greater weight to his own "red flags" than to his own expert's professional opinion that Harvey did not have organic brain damage. Again, we cannot conclude that Watson was deficient for trusting his own expert.

Harvey's final argument is that the case, here, is "highly analogous" to Rompilla v. Beard, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005);

_____

concerns to Watson and told Watson that he did not think Harvey had brain damage.

Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003);

Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); and

Williams v. Allen, 542 F.3d 1326 (11th Cir. 2008); therefore, the Florida Supreme

Court's finding that Watson's investigation was objectively reasonable constituted

an unreasonable factual determination under AEDPA, 28 U.S.C. § 2254(d)(2). As

with Harvey's personal history argument, his mental investigation argument is

nothing like the arguments advanced in these cases. As laid out above, each case

involved an attorney who overlooked a readily available document that would

have opened doors to undiscovered mitigation evidence. See Rompilla, 545 U.S.

at 383–84, 125 S. Ct. at 2464; Wiggins, 539 U.S. at 523–25, 123 S. Ct. at

2536–37; Taylor, 529 U.S. at 395, 120 S. Ct. at 1514; Allen, 542 F. 3d at 1339.

No such document existed for Harvey. Without a similar smoking gun, we cannot

disagree with the Florida Supreme Court's finding that Watson acted reasonably in

trusting his expert's opinion that Harvey did not have brain damage.

VI.

Based on the foregoing analyses, the district court's denial of Harvey's

petition for a writ of habeas corpus is

AFFIRMED.

78